650 A.2d 958

JOSEPH P. ABBAMONT, JR., PLAINTIFF–RESPONDENT, v.
PISCATAWAY TOWNSHIP BOARD OF EDUCATION,
DEFENDANT–APPELLANT.

Argued September 26, 1994—Decided December 22, 1994.

*David B. Rubin* argued the cause for appellant (*Rubin, Rubin, Malgran, Kaplan & Kuhn,* attorneys).

*Glen D. Savits* argued the cause for respondent (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Savits* and *Laura J. Bogaards,* on the briefs).

*Jaynee LaVecchia,* Assistant Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney; *Jack M. Sabatino,* Assistant Attorney General, on the brief).

*Richard M. Schall* submitted a brief on behalf of *amicus curiae* New Jersey Employee Lawyers Association (*Tomar, Simonoff, Adourian & O'Brien,* attorneys).

*Kathleen A. Naprstek* submitted a letter brief on behalf of *amicus curiae* New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a non-tenured public school industrial arts teacher claimed that his employer, the local board of education, through its supervisory employees, retaliated against him by not rehiring him as a tenured teacher because he complained about inadequate health and safety conditions in the school's metal shop. The teacher filed a complaint against the board of education alleging that its conduct violated the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –9 (CEPA). The board contended that it was not vicariously liable for the actions of its school officials.

The case is before the Court on our grant of the petition for certification filed by the board of education, and the appeal as of right filed by the board of education under *Rule* 2:2–1(a)(2), based on a dissent in the Appellate Division, whose opinion is reported at 269 *N.J.Super.* 11, 634 *A.*2d 538 (1993).

The major issues presented on the appeal are whether a local board of education may be held vicariously liable for the retaliatory acts of its school officials in an action brought under CEPA and whether punitive damages are available in such an action.

I

In September 1985, plaintiff, Joseph P. Abbamont, Jr., was hired by defendant, Piscataway Township Board of Education (board), to teach industrial arts. Plaintiff was employed by defendant in Quibbletown Middle School for the 1985–86, 1986–87, and 1987–88 school years.

From the beginning of his employment, plaintiff expressed concern about the poor health and safety conditions of the metal shop, including broken machines, lack of air ventilation, inadequate lighting, and slippery floors. In either December 1985 or January 1986, plaintiff completed a required safety inspection checklist in which he listed a number of items as "unsatisfactory," including the air ventilation. That form was sent to Edward McGarigle, Principal of the Middle School, and the Industrial Arts

Supervisor for the District, Jerry Papariello. Later that month, plaintiff again raised health and safety concerns about the metal shop with McGarigle. In January 1986, Dr. John Coogan from the State Department of Education inspected plaintiff's shop as part of a State monitoring team; plaintiff informed him of the health and safety problems. 269 *N.J.Super.* at 16, 634 *A.*2d 538.

In February 1986, according to plaintiff, he and McGarigle met, at which time the two agreed that plaintiff would teach plastics instead of metals. However, plaintiff expressed concern about the lack of air ventilation because, like metal-shop machinery, plastics machinery creates fumes and requires separate ventilation hoods. Again, in June 1986 and June 1987, when plaintiff submitted his list of needs for the upcoming school year, he requested repair of the ventilation system. *Id.* at 17, 634 *A.*2d 538. The ventilation system, however, was not repaired in September 1987. Plaintiff complained to Papariello and McGarigle again.

On October 19, 1987, plaintiff and the wood shop teacher, Carl Schweitzer, sent a joint letter to Superintendent of Schools Burt Edelchik asserting that they had been having problems with repair and replacement of broken equipment in the shops and that they could not get responses from either McGarigle or Papariello. Edelchik responded by requesting more information, and plaintiff and Schweitzer responded to that request in an October 27, 1987 letter, which included all their requests to McGarigle and Papariello since plaintiff's hiring. Plaintiff sent copies of the Edelchik correspondence to McGarigle and Papariello. *Ibid.* Edelchik later informed plaintiff that "most of the things were taken care of" because he had met with McGarigle and Papariello. *Ibid.*

During the fall of 1987, plaintiff began to experience dizziness, nausea, headaches, coughing and trouble breathing. He was diagnosed as having a pulmonary condition. *Ibid.* Plaintiff continued to operate the shop machines until December 1987, when a student in plaintiff's plastics course collapsed, allegedly from the fumes in the shop.

On January 3, 1988, plaintiff wrote to Edelchik again, recounting his concerns about the health and safety conditions in the shop, reporting his and his student's health problems, and requesting that OSHA check the shop for air quality and other safety hazards. *Id.* at 18, 634 *A.*2d 538. A copy of that letter was sent to McGarigle along with a statement that plaintiff would no longer use the plastics machines until the ventilation problems had been addressed, and a suggestion that the plastics course be changed to technical drawing. Edelchik informed plaintiff that an air-quality check would be completed to determine whether the shop was safe, and that he should immediately shut down the plastics machines to avoid exposing the students to anything that plaintiff thought would be dangerous.

On January 15, 1988, plaintiff wrote to Dr. Virginia Brinson, the Middlesex County Superintendent of Schools, "telling her who I was and what my problems were and how much trouble I was having." *Ibid.* After an inspection, of which plaintiff was not informed, McGarigle met with plaintiff and Schweitzer. The inspection report listed only minor safety changes; it did not mention ventilation. According to plaintiff, McGarigle discovered at that meeting that the inspector had not been qualified to check air quality. McGarigle also stated that he was aware that a part needed for the proper ventilation of the shop had not been installed for one-and-one-half years.

In February 1988, plaintiff's doctor determined that he should not return to the metal shop until the air had been tested, and wrote a letter describing plaintiff's condition. *Id.* at 19, 634 *A.*2d 538. Plaintiff was permitted to take a temporary leave of absence. Around that time he filed two workers' compensation claims for his work-related illnesses.

After plaintiff stopped teaching, an air-quality test was performed. The report, which the board received on March 10, 1988, stated that the classroom was safe from all nuisance particles. Plaintiff, however, was not informed of the favorable air-quality report.

On April 18, 1988, plaintiff received a letter from the board notifying him that he would not be rehired. *Ibid.* Plaintiff appealed the board's decision. In January 1989, the board affirmed its decision to terminate plaintiff. Plaintiff then filed a complaint against the board under CEPA, seeking reinstatement and back pay, attorneys' fees, punitive damages, and costs.

The trial court, ruling that a judge and not a jury should determine the issue of punitive damages, severed that claim from the jury trial. On the remaining claims, the jury returned a verdict in favor of the plaintiff, and awarded compensatory damages of $60,000. The trial court, however, granted the board of education's motion to dismiss the complaint, upon which it had earlier reserved decision, concluding that plaintiff had not established vicarious liability of the board based on the actions of its supervisory school officials.

On appeal, the Appellate Division reversed the trial court, reinstated the jury verdict, and remanded the case for a jury trial on punitive damages. 269 *N.J.Super.* at 33, 634 *A.*2d 538. One judge dissented, reasoning that punitive damages could not be awarded under CEPA. *Id.* at 34, 634 *A.*2d 538 (Petrella, J.A.D., dissenting).

## II

The primary issue is whether defendant, the local board of education, may be held vicariously liable as a public employer under CEPA for its decision, based on the recommendations of its principal and superintendent, not to rehire plaintiff with tenure because of complaints plaintiff had made concerning health and safety conditions in the school. The derivative issue is whether the evidence supports the determination that the conduct of the supervisory officials and the board constituted "retaliatory action" under CEPA.

### A.

Plaintiff claims that defendant's decision not to rehire him as a tenured teacher constituted "retaliatory action" under CEPA. He

contends that he was fired for his "objections to and refusal to participate in an activity he reasonably believed to be incompatible with a clear mandate of public policy concerning the public, health, safety or welfare," and for "disclosing and/or threatening to disclose to defendant's supervisors a policy or practice of defendant that he reasonably believes was in violation of a law, rule or regulation promulgated pursuant to law."

CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." *N.J.S.A.* 34:19–2e. Plaintiff additionally asserts that as an "employer," the board of education was liable under CEPA for that retaliatory action of its officials, the superintendent and principal. Under CEPA, "employer" is defined as

> any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or *a school district*, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.
>
> [*N.J.S.A.* 34:19–2a (emphasis added).]

Further, plaintiff claims that the superintendent and principal acted in supervisory capacities. The statute defines "supervisor" as

> any individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under ... this act.
>
> [*N.J.S.A.* 34:19–2d.]

In charging the jury, the trial court declared that the board would not be vicariously liable for any illegal retaliatory acts attributed to its superintendent and principal unless the jury found that the board had known, or should have known, of those acts and had ratified or agreed to them. In later granting defendant's motion to dismiss plaintiff's complaint, the trial court ruled that plaintiff had not established a *prima facie* case of vicarious liability because McGarigle did not have the authority to

take corrective action due to his limited budget powers and his inability to contract for outside services and consequently was not a "supervisor" under *N.J.S.A.* 34:19–2d. The trial court also ruled that under CEPA a public body may not be vicariously liable for the wrongful or illegal acts of its employees unless it specifically "consents" to those acts. *N.J.S.A.* 34:19–2a. The court further determined that plaintiff had failed to make his disclosure "to someone beyond ... a supervisor within the meaning of the statute" as required by *N.J.S.A.* 34:19–3a.

The Appellate Division unanimously ruled that the trial court had erred in holding that plaintiff had not established a *prima facie* CEPA case. It concluded that (1) McGarigle was a "supervisor" under *N.J.S.A.* 34:19–2d, 269 *N.J.Super.* at 21–23, 634 *A.*2d 538; (2) the statute does not require plaintiff to disclose to "someone beyond ... a supervisor," but requires disclosure only "to a supervisor or to a public body," *id.* at 23, 634 *A.*2d 538; and (3) CEPA does not require the "specific consent" of the employer to the unlawful retaliatory acts, *id.* at 25–27, 634 *A.*2d 538. The Appellate Division reversed the trial court, finding that defendant was vicariously liable for the improper actions of its employees, Superintendent Edelchik and Principal McGarigle. *Id.* at 28, 634 *A.*2d 538.

### B.

Under CEPA an employer can be "any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." *N.J.S.A.* 34:19–2a. Further, such an employer can be a governmental entity, that is, one of the "branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district." *Ibid.* The courts below differ over whether that provision of CEPA imports the traditional principles of *respondeat superior* for determining whether an employer may be deemed vicariously liable for the wrongful actions of its employees.

Under the doctrine of *respondeat superior*, an employer is liable to a third party for the torts of one of its employees if that employee is acting within the scope of his or her employment. *Di Cosala v. Kay*, 91 *N.J.* 159, 168–69, 450 *A.*2d 508 (1982); *Gilborges v. Wallace*, 78 *N.J.* 342, 351, 396 *A.*2d 338 (1978). An employee is acting within the scope of employment if the action is " 'of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master.' " *Di Cosala, supra,* 91 *N.J.* at 169, 450 *A.*2d 508 (citing *Restatement (Second) of Agency* § 228 (1957) (alteration in original)); *see* 1 J.D. Lee & Barry A. Lindahl, *Modern Tort Law: Liability and Litigation* § 7.01, at 186 (rev. ed. 1993); W. Page Keeton et al., *Prosser and Keeton on Torts* § 70, at 505 (5th ed. 1984).

Recently, in *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993), the Court considered the standard for imposing liability on a private employer for its supervisor's sexual harassment of an employee under the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42. The Court ruled that agency law should govern employer liability for compensatory damages. *Id.* at 617, 626 *A.*2d 445. It was "satisfied that agency principles are sufficiently well-established to provide employers with notice of their potential liability and also sufficiently flexible to provide just results in the great variety of factual circumstances presented by sexual harassment cases and to accomplish the purposes of the LAD." *Id.* at 619, 626 *A.*2d 445. The Court noted that "the Legislature, in amending the LAD to allow 'all remedies available in common law tort actions,' implied that 'common law rules of liability, including general principles of agency law' should apply." *Ibid.* (quoting from the Appellate Division, 255 *N.J.Super.* 616, 660, 605 *A.*2d 1125 (1992) (Skillman, J.A.D., concurring in part and dissenting in part)).

The Court was concerned in *Lehmann* with defining standards for liability that would achieve the statutory objectives and effectuate the legislative purpose of LAD. It characterized the "cru-

cial issue" to be determining which standard of liability provided the "most effective intervention and prevention of employment discrimination." *Lehmann, supra*, 132 *N.J.* at 625, 626 *A.*2d 445. Resolving that issue, the Court structured a three-level standard for determining the liability of employers:

> First, strict liability should apply for relief that is equitable in nature. Second, agency principles, which include negligence, should be applied to decide if an employer is liable for compensatory damages that exceed that equitable relief. Third, a higher level of culpability than mere negligence should be required for punitive damages.

> [*Id.* at 626, 626 *A.*2d 445.]

■ We conclude that the analysis and principles of *Lehmann* are appropriate to our consideration of the essential elements of a cause of action under CEPA and hold that the standards governing employer liability as determined and explained in that decision are fully applicable to actions brought under CEPA.

The Court in *Lehmann* clearly indicated that its determination of the scope of employer liability under LAD was influenced by considerations of public policy. 132 *N.J.* at 625, 626 *A.*2d 445. Those considerations of public policy inform our analysis of the scope of employer liability for retaliatory conduct under CEPA.

In 1986 the Legislature enacted CEPA to protect employees from retaliatory actions by employers. That law protects "whistleblowers," "who, believing that the public interest overrides the interest of the organization he [or she] serves, publicly 'blows the whistle' if the organization is involved in corrupt, illegal, fraudulent, or harmful activity." Ralph Nader et al., *Whistleblowing: The Report of the Conference on Professional Responsibility* vii (Ralph Nader et al., eds., 1972). As the bill's sponsor stated, CEPA's enactment is "important to all New Jersey workers who are concerned about working in a safe environment with honest employers." Linda Lamendola, *Safeguards Enacted for "Whistleblowers"*, The Star Ledger, Sept. 8, 1986, at 1. When signing the whistleblower law, Governor Kean explained CEPA's purpose:

> It is most unfortunate—but, nonetheless, true—that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer.
>
> It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.
>
> [Office of the Governor, *News Release* at 1 (Sept. 8, 1986).]

We are satisfied that the *Lehmann* standard provides the "most effective intervention and prevention" of retaliatory actions against employees. 132 *N.J.* at 626, 626 *A.*2d 445. Both CEPA and LAD effectuate important public policies. Each seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers. In both contexts, employers are best situated to avoid or eliminate impermissible vindictive employment practices, to implement corrective measures, and to adopt and enforce employment policies that will serve to achieve the salutary purposes of the respective legislative mandates.

In CEPA actions, as in LAD actions, "the employer is the party with the power and responsibility to hire, promote, reinstate, provide back pay, and take other remedial action." *Id.* at 617, 626 *A.*2d 445. Consequently, we conclude that to fulfill the remedial purposes of CEPA, employers should be strictly liable for equitable relief in the nature of reinstatement, restoration of back pay and the like.

Further, we hold, as *Lehmann* held with respect to employers in LAD actions, that the traditional doctrine of *respondeat superior* governs employer liability for compensatory damages under CEPA. Agency law is "sufficiently flexible to provide just results in the great variety of circumstances presented by [the retaliatory discharge of whistleblowers] · and to accomplish the purposes of [CEPA]." *See Lehmann, supra,* 132 *N.J.* at 619, 626 *A.*2d 445.

■ Similarly, just as the *Lehmann* Court imposed a higher standard of liability for punitive damages in LAD actions, *id.* at 624–26, 626 *A.*2d 445, a stricter standard for imposing liability for punitive damages is appropriate in CEPA actions. Therefore, in CEPA actions, "the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." *Id.* at 625, 626 *A.*2d 445. The Appellate Division expressed that stricter standard: "A greater threshold than mere negligence should be applied to measure employer liability for punitive damages; they are to be awarded when the wrongdoer's conduct is especially egregious but 'only in the event of actual participation by upper management or willful indifference.'" 269 *N.J.Super.* at 31, 634 *A.*2d 538 (quoting *Lehmann, supra,* 132 *N.J.* at 624–25, 626 *A.*2d 445); *see* discussion *infra* at 425–433, 650 *A.*2d at 968–972.

Defendant has argued that the *Lehmann* liability framework should not apply to CEPA because its statutory purposes and elements demand a different and stricter standard.

■ First, defendant asserts that traditional agency principles are not appropriate under CEPA because CEPA actions, unlike LAD actions, require a showing of intent. However,

[a]ccording to the trend of modern authority, the liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was wilful and intentional or was unintentional, but upon whether the employee, when he did the wrong, was acting in the prosecution of the employer's business and within the scope of his authority, or had stepped aside from that business and done an individual wrong.

[53 *Am.Jur.2d* Master & Servant § 438 (1970).]

*See Lehmann, supra,* 132 *N.J.* at 619, 626 *A.*2d 445; W. Prosser, et al., *Cases and Materials on Torts* 685 (7th ed. 1982) ("*Respondeat superior* is not limited to negligent torts. An employer may be held liable for the intentional torts of his servant when they are reasonably connected with the employment and so within its 'scope.'"). Therefore, CEPA, even though it covers intentional conduct, does not preclude the application of traditional agency principles.

Second, defendant argues that CEPA, *N.J.S.A.* 34:19–2a, unlike LAD, requires the "specific consent" of the employer to the improper actions of its employees as a basis for liability. In so doing, defendant analogizes CEPA actions to federal actions under 42 *U.S.C.A.* § 1983, the prevailing interpretation of which rejects the traditional principles of *respondeat superior* in such actions against government agencies. *Monell v. New York City Dep't of Social Servs.*, 436 *U.S.* 658, 98 *S.Ct.* 2018, 56 *L.Ed.*2d 611 (1978).

However, section 1983 is distinguishable from CEPA. The language of section 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Id.* at 692, 98 *S.Ct.* at 2036, 56 *L.Ed.*2d at 636. Further, the imposition of *respondeat superior* for section 1983 actions is contrary to that statute's legislative history, which included the express rejection by Congress of language that would have provided for vicarious liability. *Id.* at 692–93, 98 *S.Ct.* at 2036, 56 *L.Ed.*2d at 636–37.

Unlike section 1983, CEPA's requirement of "consent" does not imply that the effectuation of an "official policy" be an element of the public employer's conduct in order to give rise to a cause of action. Although CEPA specifically applies to governmental bodies and includes school districts as public employers, *N.J.S.A.* 34:19–2a, it draws no distinctions between private and public employers. *Cf. Oklahoma City v. Tuttle*, 471 *U.S.* 808, 817–18, 105 *S.Ct.* 2427, 2433, 85 *L.Ed.*2d 791, 800–01 (1985) (noting that in enacting section 1983 Congress rejected Sherman Amendment, which "would have held municipalities responsible for damages to persons or property caused by private persons"). Thus, because "official policy" is not a determinant of whether employer conduct is actionable under CEPA, we infer no legislative intent based on an analogy to section 1983 that the "specific consent" of an employer constitutes an element of the statutory standard. As found by the Appellate Division, the requirement of "consent" by the employer as an element in assessing its responsibility for the actions of its employees must be understood as simply reflecting

"normal principal and agent as well as respondeat superior princi-
ples." *Id.* 269 *N.J.Super.* at 26, 634 *A.*2d 538.

We conclude, as did the Appellate Division, that "the Legisla-
ture intended that the same rules of vicarious liability applicable
to private principals also be applied to public entities." 269
*N.J.Super.* at 27–28, 634 *A.*2d 538. We hold that, consistent with
that legislative intendment, the standard for determining vicarious
liability as determined by this Court in *Lehmann,* importing
traditional agency principles, applies to CEPA actions for compen-
satory damages based on retaliatory conduct.

## C.

The Appellate Division found that the evidence amply
supports the jury determination that the actions of the board's
superintendent and principal constituted retaliatory conduct in
violation of CEPA. McGarigle and Edelchik were high-level
employees who were responsible for conditions in the shop, for
evaluating plaintiff's job performance, and for making tenure
recommendations. As this Court noted in *Lehmann,* an employer
whose supervisory employee is acting within the scope of employ-
ment will be liable for that supervisor's improper conduct. 132
*N.J.* at 619, 626 *A.*2d 445. Accordingly, we sustain the Appellate
Division determination that the actions of McGarigle and Edel-
chik, specifically their recommendation that plaintiff not be re-
hired with tenure, were within the scope of their employment.
269 *N.J.Super.* at 27–28, 634 *A.*2d 538.

The tenure laws help define the scope of authority that the
superintendent and principal exercised in this case. Under those
laws, a teacher generally will acquire tenure at the beginning of
the fourth year of employment. *N.J.S.A.* 18A:28–5. During a
teacher's first three years, school districts hire the teacher for ten-
month contracts from September to June. Tenure is not acquired
if the teacher is not rehired for the fourth year.

Plaintiff, as a non-tenured teacher, was evaluated three times
each year. 269 *N.J.Super.* at 16, 634 *A.*2d 538. Two of the three

evaluations were completed by McGarigle; the remaining one was completed by Ernie Farino, the vice-principal. Each year McGarigle wrote a final summary report based on those three evaluations. McGarigle's summaries were sent to Edelchik who, in turn, forwarded them to the board. Generally, the board followed his hiring recommendations. According to Edelchik, in his sixteen years as Superintendent he had never overturned a principal's recommendation not to rehire a teacher and, in turn, the board had never overturned his recommendation not to rehire a teacher.

In the 1985–86 summary evaluation report, McGarigle was impressed by plaintiff's performance. He rated plaintiff as competent and having strengths in all areas, with no need for improvement. Similarly, plaintiff's 1986–87 evaluations were "excellent." *Id.* at 17, 634 *A.*2d 538. However, in McGarigle's first evaluation of plaintiff for the 1987–88 year, on October 30, 1987, eleven days after plaintiff had sent McGarigle copies of his second letter to Edelchik, plaintiff was marked as having no strengths in any area, although marked as competent in all areas. In contrast, in the second evaluation for the 1987–88 school year, which was completed by vice-principal Farino on December 8, 1987, plaintiff was marked as having twelve areas of strength as a teacher and as competent in every area. *Id.* at 18, 634 *A.*2d 538. Three days after receiving the letter from plaintiff about health conditions, on January 6, 1988, McGarigle completed the third evaluation of plaintiff and again found plaintiff competent in every area, but without any strengths. *Ibid.*

On March 17, 1988, McGarigle sent a letter to plaintiff stating that McGarigle was not recommending that plaintiff be rehired in his fourth year with Quibbletown Middle School as a tenured teacher because plaintiff was unable to perform his teaching duties. McGarigle testified that he did not remember exactly when he had decided not to recommend plaintiff for rehiring, except that he had made that decision on or before March 17. Nevertheless, McGarigle did complete a summary evaluation of plaintiff on March 24, 1988.

The retaliatory nature of the course of action eventuating in the board's final decision not to rehire plaintiff based on the recommendation of its supervisory employees is chronicled by the Appellate Division. Thus, after meeting with plaintiff and Schweitzer in September 1985, McGarigle summoned plaintiff back to his office, and angrily stated:

> Mr. Abbamont, I'm going to tell you one F'n thing. I've got five years left in this place until I retire and I don't need another god damn Carl Schweitzer. Do you understand? I want you to understand that Mr. Schweitzer has tenure and you do not. Do you understand what I am saying?

Further, in an altercation with Papariello at the end of January 1988 about the shop's air quality, Papariello told plaintiff, "this is your tenure year and I'm going to tell you something, you'll never see it." *Ibid.* According to the record, Assistant Superintendent of Schools and Board Secretary Guy Vander Vliet also told plaintiff: "I'll be truthful with you. I think that maybe you should go your way and Piscataway will go the other way." *Ibid.* The next morning, following that conversation with Vander Vliet, McGarigle, who, according to plaintiff, was "extremely mad," stated, "I don't care what you do, you ain't coming back. There's no tenure. You're not going to get it. I warned you three years ago and I'm going to tell you I'll make good on my promise, you're not going to get tenure." *Id.* at 18–19, 634 *A.*2d 538.

In addition, the record supports the finding that plaintiff's complaints were, as required under CEPA, based on a reasonable belief that the conditions in the metal shop were in violation of an administrative "regulation promulgated pursuant to law" and were contrary to "a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."

*N.J.S.A.* 34:19–3 provides:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor *or* to a public body an activity, policy or practice of the employer ... that the employee *reasonably believes* is in violation of a law, or a rule or regulation promulgated pursuant to law;

\* \* \* \* \* \* \* \*

c. Objects to, or refuses to participate in any activity, policy or practice which the employee *reasonably believes:*

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

Plaintiff established the existence of health and safety administrative rules and regulations and a clear mandate of public policy applicable to conditions of the metal shop, as required under *N.J.S.A.* 34:19–3c(3). In December 1985, Papariello distributed a booklet entitled "New Jersey Industrial Arts Education Safety Guide." The guide included Title 6 of the 1977 New Jersey Administrative Code ("Vocational Education Safety Standard"), the 1982 amendment to Title 6, and the "National Standard School Shop Safety Inspection Check List." The guide also included an administrative regulation that specifically requires "dependable ventilation" that provides "a minimum amount of outdoor air supply and exhaust on movement" for different types of industrial arts, including metal work. *N.J.A.C.* 6:22–5.2. It was accompanied by a cover memorandum written by Papariello that explained the guide, instructed the industrial arts teachers to read the materials, and informed them that the board was adopting the safety guide as "our official safety guide." 269 *N.J.Super.* at 16, 634 *A.2d* 538. The regulations thus directly and specifically addressed matters of health and safety and fully reflected a mandate of public policy relating to general concerns of health, safety and environmental protection.

Plaintiff also demonstrated "a reasonable, objective belief that the conduct of the school officials was a specific violation" of those regulatory standards and "incompatible" with their public policy mandate. Plaintiff's own description of the lack of ventilation and the poor air quality in the shop and its corroboration by Schweitzer's testimony as well as plaintiff's work-related pulmonary problems underscore the reasonableness of that belief. The objectivity, as well as reasonableness, of that belief was further evidenced by the opinion of plaintiff's expert on ventilation, Mark Goldberg,

an industrial hygienist, who testified that operating the machines in plaintiff's shop without individual ventilation hoods was unsafe, given the emissions of fumes and gases created by the melting of plastics and welding of metals as well as the dust created by the grinding of metals.

### D.

We conclude, as did the Appellate Division, that plaintiff established a cause of action under CEPA. The evidence supports the determination that the supervisory employees of defendant, board of education, its principal and superintendent, engaged in retaliatory action against plaintiff for his complaints based on his reasonable and objective belief that conditions at work were contrary to law and violated administrative rules and regulations and were incompatible with a clear mandate of public policy. The recommendation not to rehire plaintiff with tenure, which was accepted by the board, was within the scope of the authority of those supervisors. That action, under well-established agency principles of *respondeat superior,* constitutes the basis for the board's vicarious liability to plaintiff for compensatory damages under CEPA.

### III

The majority of the Appellate Division determined that punitive damages were available under CEPA because in amending both CEPA and LAD, the Legislature provided not only for jury trials but also for remedies available in common-law tort actions. The majority further concluded, "Allowing plaintiff the remedies available in common law tort actions, the remedy of punitive damages herein should be decided by a jury, as it is in common law tort actions." 269 *N.J.Super.* at 29, 634 *A.*2d 538. We agree. In light of the dissents in the Appellate Division and in this Court, we explain more fully why punitive damages may be imposed against a public employer under CEPA and why punitive

damages under CEPA is an issue to be resolved by a jury as fact-finder.

A sensible and unconstrained reading of the language of CEPA, a consideration of the provisions of CEPA in light of the Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 59:13–5, a review of CEPA's legislative history, an understanding of the underlying policy concerns in awarding punitive damages against public entities, and an examination of CEPA's remedial purpose persuade us that CEPA does allow the award of punitive damages against public entities.

A plain reading of CEPA indicates that the Legislature provided that prevailing whistleblowers could be awarded punitive damages against public entities. *N.J.S.A.* 34:19–2a expressly and specifically authorizes actions against "employer[s]" that are public entities, such as a "school district" or "board." *N.J.S.A.* 34:19–3 expressly prohibits such public employers from taking retaliatory actions against employees. CEPA further specifies:

> Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in this suit. *All remedies available in common law tort actions shall be available to prevailing plaintiffs.* These remedies are in addition to any legal or equitable relief provided by this act or any other statute. The court may also order:
>
>    \*     \*     \*     \*     \*     \*     \*     \*
>
> f. *Punitive damages* ...
>
>            [*N.J.S.A.* 34:19–5 (emphasis added).]

CEPA thus provides that punitive damages are available "[u]pon a violation of any of the provisions of this act." *N.J.S.A.* 34:19–5f; *see also Knowlton v. Greenwood Indep. Sch. Dist.*, 957 *F.*2d 1172, 1182 (5th Cir.1992) (rejecting school district's argument that punitive damages are unavailable against public entity under Texas whistleblower law because plain language of statute allowed for "exemplary damages" and provided for claims against "local governmental body," which included public school districts).

Further, no specific CEPA provision exists that precludes the awarding of punitive damages against public employers. That omission must be deemed purposeful. On that point, TCA is

instructive. That Act reestablished sovereign immunity against tort claims "except where there is a statutory declaration of liability." *Burke v. Deiner,* 97 *N.J.* 465, 472, 479 *A.*2d 393 (1984). TCA expressly provides that "[n]o punitive or exemplary damages shall be awarded against a public entity." *N.J.S.A.* 59:9–2c.

TCA thus exemplifies the Legislature's ability to exclude the availability of punitive damages against public entities when it so chooses. *See also N.J.S.A.* 59:13–3 (providing "no recovery against the State for punitive . . . damages arising out of contract" allowed under Contractual Liability Act). As duly noted by the Appellate Division majority, "If the Legislature intended to exempt public entities from punitive damages under CEPA [as it did under TCA] . . . it would have done so. . ." 269 *N.J.Super.* at 30, 634 *A.*2d 538; *see Young v. City of Des Moines,* 262 *N.W.*2d 612, 622 (Iowa 1978) (noting that if legislature had intended to exempt municipal corporations from liability for punitive damages in wrongful death actions, it could have easily done so; therefore, despite state Tort Claims Act, which "specifically precluded" punitive damages, legislature's "failure to include a like immunity for municipal corporations [in false arrest statute] can scarcely be attributed to inadvertence or oversight") (The Iowa Code was later amended to exempt municipalities from liability for punitive damages in wrongful death actions. *Iowa Code Ann.* § 613A.4(5)); *Jackson v. Housing Auth.,* 316 *N.C.* 259, 341 *S.E.*2d 523, 525–26 (1986) (ruling punitive damages recoverable against city in wrongful-death action because legislature had created statutory exception to common-law prohibition against awarding punitive damages against city by specifically providing for punitive damages and by not limiting definition of "person" against whom such damages could be awarded to exclude municipal corporations); *Texas Dep't of Human Servs. v. Green,* 855 *S.W.*2d 136, 143 (Tex.Ct.App.1993) (holding that Whistleblower Act "waives the State's governmental immunity from suit from liability of state and local government entities"); Lee & Lindahl, *supra,* § 21.31, at 791 ("In a small number of jurisdictions it has either been held that a governmental entity will be liable for the punitive damages resulting from the

wrongful conduct of its agents, or there is limited authority from which it could be argued that the governmental entity would be liable given compelling ... circumstances.").

The legislative history buttresses the conclusion that punitive damages are recoverable under CEPA. In 1990, the Legislature amended both CEPA and LAD to grant plaintiffs the right to a jury trial and to make available to prevailing parties those remedies available in common-law torts. In so doing, the Legislature expressly reversed *Shaner v. Horizon Bancorp.*, 116 *N.J.* 433, 561 *A.*2d 1130 (1989), in which this Court ruled that a plaintiff bringing a LAD action was neither entitled to a jury trial nor the traditional remedies available in such a trial. Moreover, the failure of the Legislature to include in CEPA an immunity from punitive damages or to refer to TCA is significant. When the Legislature initially enacted and later amended CEPA, a "logical reason [existed] for the legislature to have included in the Act a general provision for the recovery of exemplary damages: without such a provision, it would likely have been determined that such damages were not recoverable at all from the offending governmental body." *See City of Ingleside v. Kneuper,* 768 *S.W.*2d 451, 456 (Tex.Ct.App.1989). In short, CEPA's legislative history, although sparse, does not express or imply a specific intent to incorporate the exemption from punitive damages of TCA. *Cf. Rheinecker v. Forest Labs.,* 826 *F.Supp.* 256, 257–58 (S.D.Ohio 1993) (noting that legislature "specifically considered and rejected a draft of the Whistleblower Act which would have included ... punitive damages").

Moreover, to interpret CEPA as permitting punitive damages does not ignore the legitimate policy concerns about awarding punitive damages against public entities in personal injury actions. *See, e.g., Jackson v. Housing Auth.,* 73 *N.C.App.* 363, 326 *S.E.*2d 295, 299 (1985) (stating that traditionally, municipal corporations have been exonerated from liability from punitive damages in personal injury cases for public policy reasons). We acknowledge the strength of the considerations militating against punitive

damages visited upon governmental bodies. Nevertheless, as the Appellate Division observed, "The Legislature obviously considered these reasons when it enacted CEPA; yet, the Legislature made no exception for public entities regarding punitive damages relief." 269 *N.J.Super.* at 30, 634 *A.*2d 538.

Those policy concerns are addressed in some measure by the heightened standard that we have adopted for imposing punitive damages against public entities. Under *Lehmann's* heightened standard for liability, punitive damages may be awarded only if the conduct of managerial or supervisory government officials is particularly egregious and involves willful indifference or actual participation. Based on that kind of misuse of governmental authority, punitive damages serve to effectuate the goals of a statute that is specifically designed to discourage and eradicate vindictive action by employers and to further important interests of both employees and the public.

Punitive damages generally are intended not to compensate an injured party but to punish the tortfeasor and to deter him or her and others from similar conduct. *See Restatement (Second) of Torts* § 908 (1979); W. Prosser, *Law of Torts* 9–10 (4th ed. 1971); 22 *Am.Jur.2d*, Damages § 739 (1988); 25 *C.J.S.* Damages § 117(1) (1966). When the interest transgressed is significant, punitive damages may be appropriate even when the underlying wrongful conduct is that of the government. In LAD actions, in cases of "willful or malicious acts" caused by the entity itself, full damages, including punitive, may be awarded. *Fuchilla v. Layman,* 210 *N.J.Super.* 574, 579, 510 *A.*2d 281 (App.Div.1986), *aff'd,* 109 *N.J.* 319, 537 *A.*2d 652 (1988). Similarly, the Court in *Lehmann* imposed a stricter and narrower standard of liability for punitive damages than applicable to compensatory damages. 132 *N.J.* at 625, 626 *A.*2d 445. The Legislature could reasonably have concluded that punitive damages under CEPA would constitute a stringent corrective and potent deterrent against egregious wrongdoing by upper-level supervisory government officials. We thus defer to the Legislature in including punitive damages in the

remedial arsenal available against public as well as private employers for especially virulent retaliatory conduct.

We reject the dissent's argument that to allow punitive damages against a public entity under CEPA implicitly repeals TCA's statutory prohibition against the awarding of punitive damages against public entities. 269 *N.J.Super.* at 34–35, 634 *A.2d* 538 (Petrella, P.J.A.D., concurring and dissenting). The presumption against an implied repealer is grounded in the basic statutory construction rule "that every effort should be made to harmonize the law relating to *the same subject matter.*" *State v. Green*, 62 *N.J.* 547, 554, 303 *A.2d* 312 (1973) (emphasis added); *see State v. States*, 44 *N.J.* 285, 292, 208 *A.2d* 633 (1965); *Loboda v. Clark Township*, 40 *N.J.* 424, 434–35, 193 *A.2d* 97 (1963). However, TCA and CEPA involve different subject matter.

In *Fuchilla, supra*, 109 *N.J.* at 330–32, 537 *A.2d* 652, the Court ruled that the notice provisions of TCA do not apply to LAD actions. That reasoning was based, in part, on the different purposes of the two statutes. *Id.* at 334–38, 537 *A.2d* 652. On the one hand, the purpose of LAD is "to abolish discrimination in the work place." *Id.* at 334, 537 *A.2d* 652. Therefore, awards under LAD are intended to serve not only individual interests but also the public interest. *Id.* at 337, 537 *A.2d* 652. On the other hand, the purpose of TCA is "to provide compensation to tort victims without imposing excessive financial burdens on the taxpaying public." *Id.* at 335, 537 *A.2d* 652. "[A] discrimination claim is dissimilar to those envisioned by the Legislature to be included within the coverage of the Tort Claims Act" because, in part, "[d]iscriminatory conduct actionable under the Law Against Discrimination is more akin to the malicious or willful acts exempted from the Tort Claims Act than the negligently or similarly inflicted injuries covered thereby." *See Fuchilla, supra*, 210 *N.J.Super.* at 579, 510 *A.2d* 281. Moreover, "[the Tort Claims] Act disavows any remedial purpose to vindicate societal interests or to rectify public or governmental misconduct or to protect any individual constitutional or civil right. It thus expressly prohibits exemplary

or punitive damages under the Act. *N.J.S.A.* 59:9–2c." *Fuchilla,*
*supra,* 109 *N.J.* at 344, 537 *A.*2d 652 (Handler, J., concurring).
Hence, the Court noted that LAD's different purpose "suggests
that the Legislature did not intend that the [Tort Claims] Act
apply to discrimination claims." 109 *N.J.* at 335, 537 *A.*2d 652;
*see also McGrath v. New Jersey Dist. Water Supply,* 224 *N.J.Su-*
*per.* 563, 570, 540 *A.*2d 1350 (Law Div.1986) (noting that "the Tort
Claims Act does not apply to several causes of action, such as
inverse condemnation and violation of civil rights").

The purpose of CEPA, like that of LAD, is different from
that of TCA. The whistleblower statute, like LAD, is a civil rights
statute. Its purpose is to protect and encourage employees to
report illegal or unethical workplace activities and to discourage
public and private sector employers from engaging in such con-
duct. Consistent with that purpose, CEPA must be considered
"remedial" legislation and therefore should be construed liberally
to effectuate its important social goal. Judiciary, Law and Public
Safety Committee, *Statement on Assembly Bills No. 2872, 2118,*
*2228* (1990) (indicating that "the remedies available under the
'whistleblower' act are to be liberally construed"); *see also Sabella*
*v. Lacey Township,* 204 *N.J.Super.* 55, 59, 497 *A.*2d 896 (App.Div.
1985) (noting that remedial statutes must be liberally construed);
*Metpark Inc. v. Kensharper,* 206 *N.J.Super.* 151, 156, 501 *A.*2d
1068 (Law Div.1985) (ruling that remedial statutes will be con-
strued to give words the most extensive meaning to which they
are susceptible). Like LAD, CEPA promotes a strong public
policy of the State: "We view this legislation as a reaffirmation of
this State's repugnance to an employer's retaliation against an
employee who has done nothing more than assert statutory rights
and protections and a recognition by the Legislature of a preexist-
ing common-law tort cause of action for such retaliatory dis-
charge." *Lepore v. National Tool & Mfg. Co.,* 115 *N.J.* 226, 228,
557 *A.*2d 1371 (quoting *Lepore,* 224 *N.J.Super.* 463, 470, 540 *A.*2d
1296 (1988)), *cert. denied,* 493 *U.S.* 954, 110 *S.Ct.* 366, 107 *L.Ed.*2d
353 (1989). "In New Jersey, we are deeply committed to the

principle that an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy." *D'Agostino v. Johnson . & Johnson, Inc.,* 225 *N.J.Super.* 250, 265, 542 *A.*2d 44 (App.Div.1988), *aff'd o.b.,* 115 *N.J.* 491, 559 *A.*2d 420 (1989); *see Parker v. M & T Chems., Inc.,* 236 *N.J.Super.* 451, 457, 566 *A.*2d 215 (App.Div.1989); *Potter v. Village Bank,* 225 *N.J.Super.* 547, 543 *A.*2d 80 (App.Div.), *certif. denied,* 113 *N.J.* 352, 550 *A.*2d 462 (1988).

█ We conclude, further, that punitive damages, which are available under CEPA against public entities, should be determined by a jury as the trier of fact.

█ *N.J.S.A.* 34:19–5(f) provides that the "court may" impose punitive damages. Seemingly, the trial court interpreted that provision to justify its removal of the punitive damages issue from the jury. However, as noted, the 1990 amendments to CEPA and LAD created the right to a jury trial and common-law tort remedies. *See* discussion, *supra* at 427–428, 650 *A.*2d at 969. In overruling *Shaner, supra,* 116 *N.J.* at 457, 561 *A.*2d 1130, which held that "an action under the Law Against Discrimination does not entail the right to a trial by jury," the Legislature sought to treat LAD and CEPA actions like common-law tort actions. In common-law tort actions, juries determine damages, including punitive damages. *See Leimgruber v. Claridge Assoc., Ltd.,* 73 *N.J.* 450, 456, 375 *A.*2d 652 (1977) (noting that the decision to award punitive damages "rests within the sound discretion of the trier of fact"); *Cabakov v. Thatcher,* 37 *N.J.Super.* 249, 259, 117 *A.*2d 298 (App.Div.1955) ("It is elementary that the amount of punitive damages assessed against a defendant in a proper case is a matter resting in the sound discretion of the jury."); 22 *Am. Jur.2d* § 739 (1988) (noting that recovery of punitive damages generally rests with jury, or court when it acts as a trier of fact). Accordingly, *N.J.S.A.* 34:19–5 provides that a jury "try the validity of any claim under this act specified in the suit."

Because punitive damages are part of common-law tort claims, we concur in the Appellate Division's conclusion that "[a]llowing plaintiff the remedies available in common law tort actions, the remedy of punitive damages herein should be decided by a jury, as it is in common law tort actions. There is no reason to remove this issue from the jury." 269 *N.J.Super.* at 29, 634 *A.*2d 538. The court's role in that setting is limited:

Due to the universal recognition of the broad discretion by a jury to determine whether to give or withhold punitive damages and, when awarded, to determine the amount to be awarded, only one area of judicial control of the exercise of jury discretion has been recognized. That area of control is over excessive punitive damage awards.

[Lee & Lindahl, *supra*, § 21.40, at 813.]

In sum, we conclude that punitive damages are available against public employees under CEPA pursuant to *Lehmann's* heightened standard of liability and those damages are to be determined by the jury as fact-finder.

## IV

The Appellate Division unanimously found that the trial court properly had admitted evidence of a workers' compensation settlement between the parties because the settlement was introduced not to establish defendant's liability, but to prove that plaintiff had a reasonable belief that safety standards were being violated due to the injuries he had suffered. 269 *N.J.Super.* at 31–33, 634 *A.*2d 538. In addition, the Appellate Division found that the trial court had properly exercised its discretion under *Evidence Rule* 4 (now *N.J.R.E.* 403) in admitting that settlement because it was neither inflammatory nor unduly prejudicial. *Ibid.*

Defendant argues that the Appellate Division erred in upholding the trial court's admission of the parties' workers' compensation settlement. Plaintiff had filed two different claim petitions, one for pulmonary and internal disability, and the other for nasal and nervous system disability. In the compensation proceeding, which combined the two claims, defendant admitted that plaintiff had "suffered exposure which resulted in permanen-

cy of a pulmonary nature" and had been "exposed to deleterious substances causing permanency of a nasal nature." A March 14, 1991 "Order Approving Settlement" included the board attorney's stipulation to "permanent disability" of "10% partial total pulmonary and neuropsychiatric, asthmatic bronchitis anxiety."

The Appellate Division determined that the settlement was admissible because it had not been used "to prove defendant's liability for plaintiff's workers' compensation claim." 269 *N.J.Super.* at 32, 634 *A.2d* 538. The court properly found *Evidence Rule* 52(1) (now *N.J.R.E.* 408) inapplicable to admission of the workers' compensation settlement for the reason that the settlement had been "offered to prove that plaintiff had a reasonable belief that safety standards were violated" because the violations had caused plaintiff to suffer illnesses as a result of his exposure to fumes in the unventilated metal shop. *Ibid.* Similarly, the Appellate Division properly found the settlement admissible under *Evidence Rule* 53 (now *N.J.R.E.* 408) because that settlement was offered not to prove defendant's workers' compensation liability, but to prove plaintiff's reasonable belief that the air quality in his shop was unsafe. *Ibid.; see Wunschel v. City of Jersey City,* 96 *N.J.* 651, 666–67, 477 *A.2d* 329 (1984) (finding that workers' compensation findings, although not binding, should be admissible as evidence at trial and accorded appropriate weight, depending on number of factors); *cf. Thornton v. Potamkin Chevrolet,* 94 *N.J.* 1, 8, 462 *A.2d* 133 (1983) (ruling arbitration award admissible as evidence in state agency employment discrimination hearing).

The board further contends that the jury instructions were "insufficient" and that plaintiff's counsel made an improper statement in his summation about the workers' compensation settlement, implying that it constituted an admission "in worker's compensation court that it maintained an unsafe workplace." We note that the board did not object to the summation or the jury charge at trial, and did not raise those issues before the Appellate Division. We are satisfied that those contentions lack merit, *R.*

2:11–3, and if errors did occur, they do not rise to the level of plain error, *R.* 2:10–2.

## V

The judgment of the Appellate Division is affirmed.

POLLOCK, J., concurring and dissenting.

With one exception, I join the majority opinion. The exception is that I believe that the Legislature did not intend that public entities should be subject to payment of punitive damages under the Conscientious Employee Protection Act (CEPA). Substantially for the reasons stated by Judge Petrella in his dissent in the Appellate Division, I dissent from that part of the majority opinion holding that plaintiff, Joseph P. Abbamont, Jr., may maintain a claim for punitive damages against the Piscataway Township Board of Education.

Ultimately, the cost of any punitive-damage award will be borne by the taxpayers of Piscataway Township. In an era of decreasing legislative support for taxes, *see L.* 1994, *c.* 2, § 1 (amending *N.J.S.A.* 54A:2–1) (decreasing rate of taxation under gross-income tax), and punitive damages, *see N.J.S.A.* 34:11B–11 (capping punitive damages for violations of Family Leave Act at $10,000 for individual suits or lesser of $500,000 or one percent of defendant's net worth for class actions or director's complaints); *N.J.S.A.* 2A:58C–5 (allowing punitive damages in products liability actions only if claimant proves "actual malice" or "wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by the product"), I doubt that the Legislature, when enacting CEPA, thought that it was overcoming the ban of the Tort Claims Act (TCA), *N.J.S.A.* 59:9–2(c), on awarding punitive damages against public entities. That statute provides: "No punitive or exemplary damages shall be awarded against a public entity." *Ibid.*

The problem, as the majority opinion recognizes, *ante* at 425–430, 650 *A.*2d at 968–970, is in reconciling the language of *N.J.S.A.*

59:9-2(c) with that of *N.J.S.A.* 34:19-5, which states that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs" under CEPA. Broadly read, the language of *N.J.S.A.* 34:19-5 could encompass an award of punitive damages against a public employer. Absent from the statute, however, is any express authorization of the award of punitive damages against public employers.

As the majority candidly acknowledges, moreover, CEPA's sparse history does not support either "a specific intent to incorporate the exemption from punitive damages of TCA," *ante* at 428, 650 *A.*2d at 969, or one "to include punitive damages against public entities," *ibid.* In the face of such enigmatic legislative history and language, the Legislature has left ample room for reasonable judges to disagree. I believe that not permitting punitive-damage awards against public employers is more consistent with the legislative intent. The best solution would be for the Legislature to revisit the issue and resolve it definitively.

Justices CLIFFORD and GARIBALDI join in this concurrence/dissent.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal on part III*—Justices CLIFFORD, POLLOCK and GARIBALDI—3.