**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1565-23

KEVIN NOAH,

     Plaintiff-Appellant,

v.

SPARTA TOWNSHIP BOARD
OF EDUCATION and MICHAEL
GREGORY,

     Defendants-Respondents.

_____

> Argued October 9, 2024 – Decided December 26, 2024
>
> Before Judges Currier and Torregrossa-O'Connor.
>
> On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0058-22.
>
> George T. Daggett argued the cause for appellant.
>
> James M. McCreedy argued the cause for respondents (Wiley Malehorn Sirota & Raynes, attorneys; James M. McCreedy, of counsel and on the brief; Gregory S. Dahl on the brief).

PER CURIAM

This matter arises out of plaintiff's filing of a Conscientious Employee Protection Act (CEPA) action, N.J.S.A. 34:19-3 to -14, after he resigned from his part-time employment with defendant Sparta Township Board of Education. Plaintiff appeals from the trial court's orders granting defendants summary judgment and denying his motion for reconsideration. Because plaintiff did not establish a prima facie CEPA claim, we affirm.

I.

Plaintiff was employed by Sparta as a part-time substitute armed security guard for two years, working approximately ten to fifteen hours a week. According to plaintiff, sometime in late fall of 2020, he and a full-time security guard, Chris Olivo, were discussing the retirement of another full-time security guard in the high school security office when principal Ron Spring stated Sparta intended to hire a female to replace the retiring guard.

Sparta interviewed four candidates for the position, including plaintiff, and hired a female substitute security guard for the full-time position. In February 2021, plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) regarding the hiring because "the previous comments from the administration (. . . Spring[]) and others to . . . Olivo indicated that they wanted to hire a female officer."

A-1565-23

Around this same time, plaintiff informed Olivo in a text message that he "want[ed] to represent the subs[titute security guards] for the union" because they "need[ed] a raise." On February 15, 2021, plaintiff texted Olivo, stating "I may resign next week." Plaintiff described his working relationship with Olivo as "sometimes pleasant and sometimes acrimonious."

On March 1, an EEOC investigator informed plaintiff that the EEOC would not pursue his complaint because Sparta was "within their right to hire a female security officer." Thereafter, plaintiff told Olivo about the complaint.

During this timeframe, plaintiff formed a committee to negotiate a salary increase for the part-time security guards, seeking to make their hourly pay equal to that of full-time security guards. Plaintiff contends this action was "well-known to the administration" because he asked Olivo to speak with defendant Michael Gregory, Director of Operations, about a raise. Olivo sent Gregory the following email:

> Mike, good afternoon. I was just advised by one of the security substitutes that some of them [are] not happy with the substitute hourly pay and would like to be brought up to the full-time security officers pay when they are working. I advised them that all I could do was pass this information to you and that I had nothing to do with their pay. A letter [regarding the] same may be being generated in which they will be trying to have all the security substitutes sign. At this time there is no letter just a verbal conversation with me and I'm just

trying to keep you in the loop so maybe we can get out in front of this.

Plaintiff paid for an application—Jobulator Alert—which is connected to Sparta's absence management system and provides immediate notifications of any listed absences of full-time security guards so a substitute can quickly accept the assignment.

Plaintiff received a notification from Jobulator Alert on March 5 that the middle school needed a substitute security guard on March 8. On March 10, plaintiff met with two other part-time security guards to discuss negotiating a pay raise. One of the guards informed plaintiff that there were two days listed in the absence management system requesting substitutes for March 10 and March 12. Plaintiff had not received notifications from Jobulator Alert regarding those days.

When plaintiff checked the absence management system, there were no absences listed. He thought he had been "disconnected from the [a]bsence [m]anagement [s]ystem" even though it was working properly. Plaintiff stated: "I hadn't worked in [six weeks] and by not being given the opportunity to work those two days I felt like, what's going on."

On March 10, plaintiff accused Olivo of locking him out of the absence management system, which Olivo denied. Plaintiff then called Olivo a

4

"chameleon" and threatened to resign, telling Olivo he would "turn in [his] clothes, ID and 2 access cards." Olivo told plaintiff he should discuss his concerns with Gregory and that Olivo would have Gregory call him. Plaintiff replied that "a few days of careful consideration are in order."

That same day, plaintiff emailed Sparta's substitute coordinator, asking her to check if he was "inadvertently deleted from any notifications for availability." The coordinator replied the following day, "your account is set up as always on our end. Is it possible that you marked yourself as unavailable for certain days?"

On March 11, plaintiff sent a letter to the interim superintendent of schools entitled "Salary Increments and Certain Other Requests." The letter stated that plaintiff was "designated by a group of 7 other [s]ubstitute [s]ecurity [o]fficers" employed by Sparta "as a liaison and authorized representative" requesting: a written agreement raising their compensation to equal that of full-time security officers, that their title be changed "from Substitute to Part Time Security Officers," new uniforms, and a copy of the insurance binder covering them.

Olivo told plaintiff he couldn't talk to him anymore and that he would have Gregory call him. Plaintiff spoke with Gregory on March 15, and described the conversation in his deposition:

Well, . . . Gregory started right out with, the administration feels you are a problem for us. We can't trust you to work with certain individuals and that I didn't want to stay in the school anymore. I wanted to quit. And I said, that's not true. . . . I asked [the coordinator] to please check my [a]bsent [m]anagement system because . . . I thought there was a problem. I said, that's not true. I still want to work . . . for . . . Sparta. And he said you weren't happy that we [hired] a female. And I was quite taken aback because I didn't notify . . . Gregory of my EEOC complaint. The only person I advised of that was . . . Olivo and that was only like a few days before that. . . . And his response. . . was that we feel you can't work with certain people. And my response was, I've been in law enforcement 29 years, I worked security, I can work with anybody. . . . And I told him that I was cognizant of the fact why they hired her and I was, you know, I wasn't happy but that I was over it.

Plaintiff further stated: "[Gregory] did compliment me saying, [Olivo] said I did a good job and he would hope that I would continue to stay on and do a good job. . . . I said, okay. Thank you. Have a nice day. That was it."

Following the call with Gregory, plaintiff called Olivo. He testified as to the conversation:

I told [Olivo], you know, my voice was raised. I was upset. I was very upset with him. Not angry, I don't think I get angry. I get upset. But I told him I was not happy. . . . I called him a piece of S[**]T. . . . I said, I can't work here anymore. I said, administration said that they have a problem with me over nothing. Over what you're telling . . . Gregory.

6

A-1565-23

Plaintiff contends that on March 15 another substitute security guard, Glenn Danzo, texted him that Spring told Danzo plaintiff was not allowed at the high school. Plaintiff stated that no one other than Danzo ever informed him he was barred from the school.

That same day, plaintiff delivered to Danzo his shirt, jacket, identification and security cards, and a resignation letter addressed to the interim superintendent. On March 18, plaintiff emailed the coordinator, informing her of his resignation and requesting she stop his receipt of job opening notifications.

## II.

Plaintiff filed this instant action against defendants, alleging their actions violated CEPA. Plaintiff asserted he was constructively terminated after advocating on behalf of other employees and filing an EEOC complaint.

After the close of discovery, defendants moved for summary judgment. They asserted that plaintiff did not suffer any adverse employment action because he was not fired, but rather freely resigned. Furthermore, even if plaintiff was fired, such action was reasonable given plaintiff's hostile behavior towards coworkers. In addition, there were no grounds for individual liability against Gregory.

A-1565-23

On November 3, 2023, the trial judge granted defendants summary judgment. In a written opinion, the judge found: defendants offered evidence that showed plaintiff was not locked out of the shift assignment software or barred from the school campus because of his EEOC complaint; defendants offered a legitimate reason for restricting plaintiff access to the school campus; and plaintiff offered only a temporal proximity to prove there was retaliatory conduct.

Specifically, the trial judge explained in:

> viewing all facts in the most favorable light to [p]laintiff, [p]laintiff failed to raise a genuine dispute of material fact that [d]efendant[s'] explanation for the shift assignment software and restricting [p]laintiff's access to the school campus was pretextual. Plaintiff claims that he reasonably believed that the hiring practice of the school was incompatible with the law, rule, regulation or clear mandate of public policy and [p]laintiff reported the practice by filing an EEOC complaint. However, [p]laintiff has failed to show a causal connection between whistleblowing activity and the alleged adverse employment action. . . . Plaintiff has only offered temporal proximity to prove that there was retaliatory conduct. Without more, temporal proximity alone is insufficient to establish retaliatory conduct.

Plaintiff subsequently moved for reconsideration. The court denied the motion on December 1, 2023. On December 14, 2023, plaintiff filed a motion to reinstate the matter for purposes of conducting oral argument on the

A-1565-23

reconsideration motion.  The trial judge granted plaintiff's motion and held oral arguments.

The trial judge denied the motion for reconsideration on January 22, 2024. The trial judge explained his reasoning in a written opinion:

> Plaintiff does not point to where the court relied upon a palpably incorrect or irrational basis or point to where it is obvious that the court either did not consider, or failed to appreciate the significance of, probative competent evidence.  The court has applied liberality to the elements of plaintiff's CEPA claim.  However, to give the kind of liberality that plaintiff is asking for to the causal nexus between the whistleblowing activity and the alleged adverse employment action goes far beyond applying CEPA liberally.

III.

On appeal, plaintiff contends the presence of material issues of fact prevented the court from granting summary judgment and the court did not understand the specific meaning of the phone call between plaintiff and Gregory.

We review the trial court's grant or denial of a motion for summary judgment de novo, applying the same standard used by the trial court.  Samolyk v. Berthe, 251 N.J. 73, 78 (2022).  We "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Friedman v. Martinez,

9

242 N.J. 449, 472 (2020) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

We review a trial judge's decision on whether to grant or deny a motion for rehearing or reconsideration under Rule 4:49-2 for an abuse of discretion. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). "The rule applies when the court's decision represents a clear abuse of discretion based on plainly incorrect reasoning or failure to consider evidence or a good reason for the court to reconsider new information." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:49-2 (2025).

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). CEPA's protection is liberally construed, consistent with its remedial purpose. Abbamont, 138 N.J. at 431. This is because its primary goal "is to protect society at large." Cedeno v. Montclair State Univ., 163 N.J. 473, 478 (2000).

To establish a prima facie CEPA claim, plaintiffs must demonstrate:

> (1) [they] reasonably believed their employer's conduct
> was violating either a law, rule, or regulation

10

promulgated pursuant to law, or a clear mandate of public policy; (2) [they] performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against [them]; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015).]

We are satisfied that plaintiff met elements one and two for a prima facie CEPA action. After plaintiff heard Spring say Sparta wanted to hire a female for the vacant full-time security guard job, and Sparta hired a female, plaintiff filed an EEOC complaint. Plaintiff believed Sparta had violated the law in disclosing its intention to hire a female and the EEOC complaint was a whistleblower activity in response.

We are not as convinced regarding element three, that an adverse employment action was taken against plaintiff because of his whistleblowing action. A retaliatory action under CEPA is the "discharge" of an employee for engaging in a protected activity. Donelson v. DuPont Chambers Works, 206 N.J. 243, 257 (2011); see N.J.S.A. 34:19-2(e). Here, plaintiff was not discharged, but instead he resigned.

Plaintiff contends his resignation was a constructive discharge in retaliation for his filing an EEOC complaint. Under CEPA, a discharge encompasses not only actual termination from employment, but also a

11

constructive discharge. Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002). A constructive discharge occurs when an employer's conduct "is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Ibid.

Plaintiff was not told by anyone with administrative authority that he was terminated or removed from the high school. He does not dispute he was never terminated. He only asserts constructive discharge and supports his contention with his own statement that Danzo, a substitute security guard without administrative authority, said he was barred from the high school. Plaintiff also did not demonstrate he was locked out of the absence management system as he conceded Olivo had no access to or authority over the system and the coordinator advised he was still listed in the absence management system.

We also note plaintiff's deposition testimony regarding his belief as to why he may have been removed from the high school. Plaintiff stated:

> Well, at that point after my conversation with . . . Gregory and after my conversation with . . . Olivo I assumed, I shouldn't use that word, I thought that [Olivo] reached out to somebody, either . . . Gregory or . . . Spring[], told him that I threatened him or yelled at him or called him a piece -- he didn't like the conversation. So he reached out to them, said something that must have flipped their switch and [t]hen he told . . . Danzo that I'm not allowed on the school property. . . .

12

This testimony demonstrates plaintiff believed his alleged removal was a direct result of his phone call with Olivo, in which he shouted and used an expletive. This contradicts plaintiff's argument that his removal from the high school, if that was going to take place, was planned before the call with Olivo. Even if we accept that plaintiff was effectively barred by the administration from the high school when Danzo so informed him, such action is not so intolerable that plaintiff had no other option but to resign.

Additionally, if Gregory was aware of plaintiff's EEOC complaint and intended to terminate him because of it, it would not make sense for Gregory to attempt to convince plaintiff to "stay on" as an employee. Plaintiff stated that during his phone conversation with Gregory, he was told he was doing a good job and Gregory hoped plaintiff would stay. These are not words uttered by someone who is terminating an employee. Rather, they were stated in response to plaintiff's threats of resignation. We discern no evidence to support a constructive discharge or any other adverse employment action.

Because plaintiff did not establish an adverse employment action, we only briefly address element four, the causal connection between the whistleblowing activity and the adverse employment action. Plaintiff relies on the Gregory call to demonstrate a causal connection but as discussed, plaintiff told Olivo five

13

days earlier that he was resigning. And Gregory's statement that he hoped plaintiff would remain with Sparta contradicts any inference that Gregory intended to terminate plaintiff because of the EEOC complaint. Furthermore, as the trial court stated, plaintiff had the verbal tirade against Olivo prior to Danzo telling him he was barred from the high school. Plaintiff has not demonstrated a causal connection between the EEOC and any adverse employment action.

Because plaintiff did not establish a prima facie CEPA action, the trial court properly granted defendants summary judgment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1565-23