**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2852-23

THOMAS TESAR and
JULIANNA TESAR,

      Plaintiffs-Appellants,

v.

SAYREVILLE BOROUGH
(POLICE DEPARTMENT),
JOHN ZEBROWSKI, and
DAVID ERLA,

      Defendants-Respondents.

_____

        Argued November 13, 2025 – Decided February 5, 2026

        Before Judges Smith and Berdote Byrne.

        On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4277-21.

        Theodore Campbell argued the cause for appellants.

        Nicole M. Grzeskowiak argued the cause for respondents (Hoagland Longo Moran Dunst & Doukas, LLP, attorneys; Nicole M. Grzeskowiak, of counsel and on the brief; Christy L. Cushing, on the brief).

PER CURIAM

Plaintiff Thomas Tesar appeals from a grant of summary judgment in favor of defendants Sayreville Borough Police Department, Chief John Zebrowski, and Lieutenant David Erla, claiming defendants retaliated against him in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, after he reported Chief Zebrowski's alleged use of a racial slur to Internal Affairs (IA) and the Middlesex County Prosecutor's Office (MCPO). The trial court found plaintiff's claims were barred by CEPA's one-year statute of limitations. We agree no actionable retaliation occurred during the year prior to the lawsuit's filing. The only potentially timely retaliatory act was the Department's investigation of plaintiff after he failed to write a police report. But the written reprimand resulting from his failure to write the report was rescinded and cannot serve to establish an adverse employment action pursuant to CEPA. Therefore, we affirm the order dismissing plaintiff's complaint with prejudice.

I.

On July 20, 2021, plaintiff filed a complaint, seeking relief pursuant to CEPA, the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, and a

2

variety of tort claims.  On April 12, 2024, the trial court granted defendants' motion for summary judgment as to all claims.  On appeal, plaintiff challenges only the grant of summary judgment of his CEPA claim.  See Green Knight Capital, LLC v. Calderon, 469 N.J. Super. 390, 396 (App. Div. 2021) ("An issue not briefed on appeal is deemed waived." (quoting Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 319 (App. Div. 2017))).

## II.

In August 2014, plaintiff was hired by the Borough of Sayreville to work as a patrol officer at the Sayreville Police Department (SPD).  In his complaint, plaintiff alleged a series of retaliatory acts and discipline taken by the Department after he reported the Chief's alleged use of a racial slur to a supervisor in July 2016.

In July 2016, plaintiff "was involved in a motor vehicle accident while responding to a first aid call involving an overdose victim, when he sustained a back injury," which necessitated physical therapy to address his injury.  After attending physical therapy in a tee shirt, shorts, and baseball cap, plaintiff returned to police headquarters, where he encountered Chief Zebrowski.  The two men had a short and cordial conversation.  Shortly thereafter, Sergeant Gawron approached plaintiff, and stated, "I just got my a[**] chewed out by the

Chief because of you." Gawron purportedly confronted plaintiff and remarked the Chief "wanted to know why he [Patrolman Tesar] was walking around the building dressed like a '[n****r].'"

After this incident, plaintiff called defendant Erla, who told plaintiff he did not believe Zebrowski would "say something like that," and advised plaintiff to have a private conversation with Zebrowski. When plaintiff confronted Zebrowski, he claimed "those words never came out of his mouth." Plaintiff ultimately decided not to file any complaint with the SPD at that time.

On February 6, 2019, the MCPO was "assigned to investigate a demeanor complaint lodged against [Zebrowski]." One week later, the MCPO obtained formal statements from various SPD employees. One stated they did not recall hearing any conversation relevant to the 2016 racial-slur incident, another admitted hearing Zebrowski refer to plaintiff with a racial slur, and yet another employee stated they could not remember the incident but reasoned it "[was] possible." On February 20, 2019, the MCPO took a formal statement from Zebrowski, in which he admitted directing another officer to discuss plaintiff's attire, but he denied using a racial slur. Based on its investigation, the MCPO determined the complaint against Zebrowski could not be sustained, but it

4

sustained demeanor complaints filed against the two other members of the department.

Plaintiff alleged that "as time passed, it became evident that specific officers within the [SPD] were attempting to avoid working with plaintiff. . . . [by] avoid[ing] responding to calls involving him in a timely manner, . . . put[ting] his personal safety at risk." At his deposition, plaintiff "clarified that this allegation only concerned the response times of [officer] Jamie Unkel." Plaintiff also testified these purported delayed response times by Unkel occurred in the 2018–2019 timeframe. Plaintiff stated on one specific call, Unkel delayed her response time to an incident that was in her area of responsibility. When asked during his deposition if he believed Unkel was trying to avoid working with him specifically, plaintiff stated:

> I don't know what her intent was. . . . I don't know if she was doing it, like I said, specifically to me or other officers. I specifically observed it happening to me. So I addressed it that way. I'm not going to speculate to what her intent was or why she was doing it.

When asked if plaintiff reported the delayed response times to IA at SPD, plaintiff replied:

> No. No, I didn't. And the point of . . . reporting these is not to try to get her in trouble. I didn't want it to get to [IA]. I just wanted the issue to be addressed whether . . . she needs to be spoken to or whatever it is. But . . .

5

the intent was never to escalate the situation or make her feel uncomfortable. It's . . . she felt a certain way, then it should have been addressed and that was my point. I don't want to take it to [IA]. I didn't think it needed to get to [IA] I wished the supervisor . . . would have addressed it. And I guess they did or didn't.

In November 2020, plaintiff submitted a bid to have his work schedule switched from A-side to B-side, "which he perceived to have a better schedule with more holidays off." Plaintiff claimed the officers that were assigned the B-side shifts were upset because they did not want to work with plaintiff. However, in 2021 and 2022, plaintiff was assigned the shift he wanted.

Plaintiff claims the junior officer who was assigned to work with plaintiff was unhappy with this outcome and offered another officer $1,000 to switch positions, which the officer declined. Plaintiff maintained this was well known throughout the department, yet no incident, investigation, or discipline was conducted. Plaintiff conceded no money was exchanged but maintained the only reason money that did not occur was because the officer rejected it. In his deposition, plaintiff stated he did not report this incident.

On November 20, 2020, Zebrowski sent individual emails explicitly directing plaintiff, Erla, and several other officers to participate in an internal investigation spearheaded by outside counsel who was "hired by [the SPD] for the purpose of conducting a neutral workplace investigation." Zebrowski did

6

not provide details of the matters underlying the inquiry. In his deposition, plaintiff testified he was being targeted because he claimed Zebrowski used a racial slur towards him in 2016. However, plaintiff conceded he "hardly remember[ed]" the investigation, had no personal knowledge as to whether Zebrowski was ever made aware of what plaintiff told the investigator, and could recall no negative consequences stemming from his participation in the investigation.

On April 25, 2021, plaintiff and another officer were dispatched to respond to a call regarding an incident at a bakery in Sayreville. The owner of the bakery observed males who appeared to be intoxicated. After the owner called the SPD, she "observed one police car drive by slowly, [but] the police car continued on its way without speaking to the males or stopping at her store." She stated the suspicious males "continued to hang out in front of her store for more than two hours . . . acting rowdy." The bakery owner also told the reporting officer "it was raining a little bit and the males were probably staying under her awning to prevent getting wet."

The following day, the officer who received the initial call observed there was no report completed on the incident. The reporting officer subsequently made a report of the incident to be forwarded to IA.

In defendants' statement of facts, they allege "plaintiff arrived first at the scene and spoke to the individuals while still inside his patrol vehicle." The individuals told plaintiff they were waiting for an Uber. Plaintiff maintained he parked in the lot for twenty minutes until another officer arrived. Plaintiff conceded he never spoke to the bakery owner to convey to her that he believed the males "did not present a threat." Plaintiff denied an internal investigation was opened against him.

During his deposition regarding the April 25, 2021 incident, plaintiff admitted part of his duties as a patrolman was to draft reports. He denied he failed to write an incident report but noted it could not be established that all interactions with the public have been consistently documented in written form.

On May 14, 2021, Erla filed a report regarding his interview of plaintiff. When asked about the minimal nature of the call, plaintiff told Erla "his training and experience . . . led him to believe no report was necessary . . . for relatively minor incidents," and believed it was "common practice." Plaintiff also told Erla he was concerned that he would be accused of harassing the three males and being racist if he tried to engage more with the men that were the subject of the bakery owner's concern.

After the investigation concluded, plaintiff was found to have violated

A-2852-23

SPD rules and regulations because he failed to properly document the incident. IA subsequently stated these violations constituted a neglect of duty. See N.J.A.C. 4A:2-2.3(a)(7). On June 2, 2021, plaintiff was issued a verbal reprimand. On June 3, 2021, plaintiff refused the verbal reprimand.

On October 28, 2021, the matter was submitted by plaintiff's supervising officer, as the grievant, to the State of New Jersey Public Employment Relations Commission arbitrator, who found the Borough acted arbitrarily and capriciously when it issued a written warning. On April 25, 2022, plaintiff's verbal reprimand was rescinded and removed from plaintiff's personnel file by IA.

Plaintiff also alleged other acts of retaliation. He claimed he spoke with a lieutenant in December 2017, and was informed an administration position would soon be open. Other officers were offered the job, but plaintiff was not informed of the opening until his conversation with the lieutenant. The lieutenant noted plaintiff's interest in the position, but plaintiff was never offered the position.

In December 2016, plaintiff admitted to stopping at his home while on duty for about 20 to 30 minutes. Plaintiff was advised by a superior to try to

limit the amount of time he spends at home but otherwise received no formal discipline.

On June 24, 2018, plaintiff arrived at headquarters for his shift after drinking alcohol earlier in the day. At line-up, a lieutenant smelled alcohol on plaintiff's breath. Plaintiff admitted to drinking alcohol earlier in the day. Zebrowski initially recommended that plaintiff receive a 45-day suspension for violating department rules, but PBA counsel negotiated a 15-day suspension of vacation time in lieu of the 45-day suspension.

In September 2018, SPD audited its officers' shift schedules after being informed that several officers were working more than sixteen hours in a single day. Plaintiff and six other officers were found to have violated this policy. A charge against plaintiff was substantiated for violating the policy.

In May 2019, SPD received a tip that plaintiff was asleep in his patrol vehicle. The supervisor who responded observed that plaintiff was awake but reclining. Plaintiff received no discipline for the incident but claimed he was reported to be asleep as retaliation for his involvement as a witness in the investigation of another officer who was allegedly asleep in his car. Plaintiff's claim was not substantiated by IA.

## III.

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). "[CEPA] protects workers who blow the whistle on their employers' illegal, fraudulent, or otherwise improper activities that implicate the health, safety, and welfare of the public." D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 114 (2007). CEPA's protection is liberally construed, consistent with its remedial purpose. Abbamont, 138 N.J. at 431. This is because its primary goal "is to protect society at large." Cedeno v. Montclair State Univ., 163 N.J. 473, 478 (2000). The statute "shields an employee who objects to, or reports, employer conduct that the employee reasonably believes to contravene the legal and ethical standards that govern the employer's activities." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 27 (2014).

To establish a prima facie CEPA claim, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

A-2852-23

(2) he or she performed a "whistle-blowing" activity described in [N.J.S.A. 34:19-3(a) or (c)];

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 177 N.J. at 462).]

To satisfy the first element of a CEPA claim, a plaintiff "must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct." Dzwonar, 177 N.J. at 463. A plaintiff "need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy" id. at 462, or that the conduct is "an actual violation of a law or regulation," Estate of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000). The plaintiff only needs to show that he "'reasonably believe[d]' that to be the case." Ibid.

The second element of a CEPA claim requires the plaintiff to prove he performed a whistleblowing activity. Lippman, 222 N.J. at 380. Pursuant to N.J.S.A. 34:19-3(a), an employee performs a protected whistleblowing activity if he or she:

Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the

employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation[.]

Third, a CEPA plaintiff must demonstrate he suffered an adverse employment action. Lippman, 222 N.J. at 380. CEPA defines retaliation as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

Finally, to satisfy the fourth element of CEPA, a plaintiff must demonstrate "a causal connection . . . between the whistle-blowing activity and the adverse employment action." Dzwonar, 177 N.J. at 462. To determine if a plaintiff has established causation, courts should focus on the "circumstances surrounding the employment action," including temporal proximity between the protected conduct and the adverse employment action. Maimone v. City of Atlantic City, 188 N.J. 221, 237 (2006). A CEPA plaintiff may establish causation by providing "evidence of circumstances that justify an inference of

retaliatory motive." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995); see also Roach, 164 N.J. at 612.

Claims pursuant to CEPA must be filed within the applicable statute of limitations, which is one year. See N.J.S.A. 34:19-5.

There is, however, an exception for conduct that is part of a pattern of continuing discriminatory conduct. Roa v. Roa, 200 N.J. 555, 566 (2010). "[T]he continuing violation theory was developed to allow for the aggregation of acts, each of which, in itself, might not have alerted the employee of the existence of a claim, but which together show a pattern of discrimination." Id. at 569. Thus, "a plaintiff may pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." Shepard v. Hunterdon Dev. Ctr., 174 N.J. 1, 6-7 (2002).

However, "the doctrine does not permit . . . the aggregation of discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable." Roa, 200 N.J. at 569.

As the trial court correctly held, the continuing violation theory does not apply because plaintiff alleges a series of discrete acts of retaliation. Plaintiff

attempts to avoid the statute of limitations by framing what are in fact a series of discrete acts as a pattern of retaliation constituting a hostile work environment. He claims, for example, that the discipline he faced for arriving at work intoxicated and violating the department's sixteen-hour rule was part of a pattern of retaliatory harassment for reporting the racial slur. But this argument overlooks the fact that discrete acts of retaliation are distinct from a hostile work environment:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.
>
> [Shepherd, 174 N.J. at 19 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)).]

The discrete acts of retaliation alleged by plaintiff, like a retaliatory discharge, would have been actionable under CEPA as soon as they occurred. Cf. Roa, 200 N.J. at 569 ("[A] discharge is a discrete discriminatory act that places an employee on notice of the existence of a cause of action and of the need to file a claim. The statute of limitations begins to run on the day that act takes place."); O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006) (noting

15

"a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim. The former must be raised within the applicable limitations period or they will not support a lawsuit.").

For any of plaintiff's allegations to be timely, the retaliation must have occurred after July 20, 2020, a year before plaintiff filed his complaint. The only viable act of potential retaliation falling within that time frame is the reprimand plaintiff received after failing to write a police report. However, there was no adverse employment action associated with this incident because the reprimand was subsequently rescinded. See Beasley v. Passaic Cnty., 377 N.J. Super. 585, 607 (App. Div. 2005) ("[R]escinded employer action that makes plaintiff completely whole and remedies a prior decision cannot constitute an adverse employment action."). Because he cannot demonstrate an adverse employment action in connection with this incident, plaintiff failed to demonstrates a prima facie case under CEPA. Thus, the trial court correctly granted summary judgment as to plaintiff's CEPA claim.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

16