**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3581-23

JOHN SLOAN,

     Plaintiff-Appellant,

v.

CAPE REGIONAL MEDICAL
CENTER, INC., CAPE REGIONAL
HEALTH SYSTEM, INC., ED
MOYLETT, JOANNE
CARROCINO, MARK GILL, and
BYRON HUNTER,

     Defendants-Respondents.

_____

Argued October 29, 2025 – Decided February 18, 2026

Before Judges Currier and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0462-20.

Matthew A. Luber argued the cause for appellant (McOmber McOmber & Luber, PC, attorneys; Matthew A. Luber, Meghan A. Pazmino, and Jeffrey D. Ragone, on the briefs).

Brian J. McGinnis argued the cause for respondents (Fox Rothschild LLP, attorneys; Jacob S. Perskie and Brian J. McGinnis, on the briefs).

Alan H. Schorr argued the cause for amicus curiae National Employment Lawyers Association – New Jersey (Schorr & Associates PC, attorneys; Alan H. Schorr, of counsel and on the brief).

PER CURIAM

Plaintiff John Sloan appeals from a May 17, 2024 order granting summary judgment to defendants Cape Regional Medical Center, Inc., Cape Regional Health System, Inc., Ed Moylett, Joanne Carrocino, Mark Gill, and Byron Hunter. Plaintiff, who was employed by defendants until his termination in October 2020, filed a complaint alleging violations of the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -14. On appeal, plaintiff argues the trial court erred in holding he did not adequately identify the regulations that were the subject of his CEPA complaints.

Plaintiff made several complaints about defendants' failure to comply with fire-safety regulations by not inspecting fire extinguishers, exit lights, and sprinkler systems. The specific regulations were never clearly identified by plaintiff during discovery, as required to support a CEPA action. Thus, the trial court properly found plaintiff could not assert those claims.

A-3581-23

However, plaintiff also made complaints about the temperature and humidity levels in the hospital's operating rooms, and electrical work in the hospital's sewage ejector pit. The relevant regulations for these complaints were identified by plaintiff in his opposition to summary judgment. Therefore, we reverse the trial court's order granting summary judgement and remand, limiting the claims to these two alleged areas of violation.

We affirm in part, reverse in part, and remand consistent with this opinion.

I.

In February 2018, plaintiff began working for defendants Cape Regional Medical Center, Inc. and Cape Regional Health System, Inc. as the director of plant operations. The entities are "an integrated health system in Cape May County . . . comprised of [d]efendant Cape, urgent care facilities with over [sixty] primary care providers and specialists, [cancer] [c]enters and several other outpatient facilities within the network." In his role, plaintiff was responsible for ensuring Cape's maintenance, repair, and safety needs were in compliance with all regulations and codes. In addition to plaintiff, Cape also employed defendants Moylett, Carrocino, Gill, and Hunter. Moylett worked as the Director of Human Resources and Safety Officer. Carrocino was Chief

Executive Officer and directly supervised plaintiff. Gill was Chief Financial Officer, and Hunter served as the Vice President of Human Resources.

Throughout his employment, plaintiff observed the temperature and humidity levels in defendants' operating were not in compliance with Centers for Medicare and Medicaid Services (CMS) regulations, which he reported. Plaintiff alleges he was told to "disregard the levels and instead lower the Operating Room temperatures under the guise that the room was too 'hot' for employees." Plaintiff maintains he was threatened with discipline if he did not stop his workplace complaints.

In March 2020, after the first COVID-19 case was reported in New Jersey, plaintiff alleged his concerns regarding patient safety escalated. As the director of plant operations, plaintiff created and implemented procedures to prepare defendants for the inevitable increase in patients during the COVID-19 pandemic. Plaintiff alleges defendants did not "(i) implement proper safety procedures, (ii) [keep up] with hospital maintenance, (iii) follow social distancing guidelines, or (iv) follow personal protective equipment [PPE] guidelines," which placed defendants' employees and patients at risk. Plaintiff complained about defendants' allowing employees to wear "homemade cloth masks instead of the medical grade masks, face shields[,] and N-95 masks,"

4

failing to clean employees' masks after promising to do so; permitting food deliveries to COVID-19 patient floors without ensuring the wearing of proper PPE; and allowing employees treating COVID-19 patients "to touch food with their infectious gloves and gowns before distributing food for consumption."

On March 23, 2020, defendants Regional Health Systems and Medical Center furloughed fifty percent of its employees working in non-direct patient care departments. Plaintiff, who was worried about having a reduced staff and being able to continue meeting required safety standards during the pandemic, informed defendant Carrocino "that he would not be able to maintain hospital equipment and implement all safety precautions/procedures with only [fifty percent] of the staff" in his department. He alleges that his concerns went unaddressed.

Plaintiff noted his concerns to Carrocino in weekly reports. His reported concerns included the following, which he included in his complaint:

- Several rotted Reheat Coil lines in the ceiling of the [Behavioral Health Unit] that have started leaking and need to be replaced.

- All preventative maintenance on building equipment (i.e. Medical gas alarm inspections, fire extinguisher inspections, exhaust and return vents throughout entire campus).

- All critical Life Safety Code [LSC] testing & Inspections.

- Replacement of failed insulation causing ceiling leaks and stained ceilings; and

- Unable to gain access to beds for calibration testing.

On April 21, 2020, plaintiff sent an email with the subject line "[LSC] Compliance" to Moylett, informing him that defendants should submit a waiver for its non-compliance with the LSC, which includes fire protection requirements. Plaintiff requested that Moylett meet with him to discuss waiver documents but claims Moylett failed to respond for approximately two months, leading to defendants' failure to submit the waiver request by the deadline.

On April 30, 2020, plaintiff was informed there was a COVID-19-positive patient in a room that was not a "negative pressure room," a room intended "to prevent virus droplets from spreading." Plaintiff alleged he immediately warned defendants the room with the COVID-19-positive patient was not a negative pressure room, but defendants, "[c]ontrary to all COVID-19 protocols," decided to continue keeping the COVID-19 patient in the standard room and directed its employee to continue doing so as "long as the door [to the room] was shut."

Additionally, in August 2020, plaintiff emailed Carracino and several others, informing them the hospital's sewage ejector pit was not in compliance

with the National Electric Code (NEC). Plaintiff attached a photo to this email, and the specific subsections of the NEC were written on the photo.

Plaintiff alleges that "[a]fter months of advising [d]efendants of the unsafe working conditions[,] . . . in clear retaliation, [p]laintiff was advised by [a maintenance manager] that . . . departments were placing complaints about [p]laintiff's department not fulfilling work requests." In response, plaintiff sent an email to the heads of all departments informing them his department would be taking maintenance requests only through the work-order request system. Plaintiff also noted there were over 1,400 preventative work orders that were two months behind for "inspections, testing, maintenance[,] and repairs of critical equipment for the operations to all of the buildings."

After reading plaintiff's email, Carrocino allegedly "screamed at him," called him "stupid," told him he "created a liability issue for the organization," and demanded he recall the email. Plaintiff maintains Carrocino continued to retaliate against him. Plaintiff also alleges he then began to receive emails from Carrocino accusing him of having work performance issues. In September 2020, plaintiff again complained about the out-of-compliance humidity and temperature levels in operating rooms, but this time complained to "the Physician Director and Infection Control Person."

7

On October 8, 2020, defendants Moylett and Hunter met with plaintiff and informed him he was being investigated regarding COVID-19 protocol errors that occurred in April 2020—specifically, that return vents in the ICU were not covered, which put patients and defendants' employees at risk for being exposed to COVID-19. Plaintiff claims he was unaware these vents were uncovered and he was never informed of this before the meeting. Plaintiff also alleges he was accused of failing to purchase HEPA filters for the ventilation system, which plaintiff called "blatantly untrue." At this meeting, Moylett and Hunter suspended plaintiff. They told plaintiff he would be contacted on October 13, 2020, after the investigation. Plaintiff claims he was not contacted on that date. Thereafter, he contacted defendants to inquire about his employment. At a subsequent meeting on October 16, 2020, plaintiff met with Moylett, Carrocino, and Hunter and was told he could resign or be terminated. Plaintiff refused to resign and was terminated.

## II.

"We review a trial court's decision on a motion for summary judgment de novo, 'applying the same standard used by the trial court.'" Obiedzinski v. Twp. of Tewksbury, 480 N.J. Super. 45, 60 (App. Div. 2024) (quoting Samolyk v. Berthe, 251 N.J. 73, 78 (2022)). The applicable standard

requires the court to review the evidence in the light most favorable to the non-moving party, and to enter summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."

[Allen v. Cape May Cnty., 246 N.J. 275, 288-89 (2021) (quoting R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995)).]

"Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). "[CEPA] protects workers who blow the whistle on their employers' illegal, fraudulent, or otherwise improper activities that implicate the health, safety, and welfare of the public." D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 114 (2007). The statute "shields an

9

employee who objects to, or reports, employer conduct that the employee reasonably believes to contravene the legal and ethical standards that govern the employer's activities." Hitesman v. Bridgeway Inc., 218 N.J. 8, 27 (2014).

To establish a prima facie CEPA claim, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in [N.J.S.A. 34:19-3(a) or (c)];
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 177 N.J. at 462).]

To satisfy the first element of a CEPA claim, a plaintiff "must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct." Dzwonar, 177 N.J. at 463. A plaintiff "need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy," id. at 462, or that the conduct is "an actual violation of a law or regulation." Est. of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000). The plaintiff need only show he "'reasonably believe[d]' that to be the case." Ibid.

Thus, a plaintiff who brings a CEPA claim is not required to show their employer's conduct was actually fraudulent or illegal. See id. at 462. However, if the judge finds no law or policy that closely relates to complained-of conduct, the judge "can and should enter judgment for [the] defendant." Dzwonar, 177 N.J. at 463.

While a CEPA plaintiff need not show an actual violation, he or she must identify "a statute, regulation, rule, or public policy that closely relates to the complained-of conduct." Ibid. A mere disagreement with an employer's practice, policy, or activity is insufficient to defeat summary judgment. Young v. Schering Corp., 275 N.J. Super. 221, 236-37 (App. Div. 1994). See Hitesman, 218 N.J. at 32 ("[A] pivotal component of a CEPA claim is the plaintiff's identification of authority in one or more of the categories enumerated in the statute that bears a substantial nexus to his or her claim.").

The second element of a CEPA claim requires the plaintiff to prove he or she performed a whistle-blowing activity. Lippman, 222 N.J. at 380. Pursuant to N.J.S.A. 34:19-3(a), an employee performs a protected whistle-blowing activity if he or she:

> Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a

business relationship, that the employee reasonably believes:

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation[.]

Third, a CEPA plaintiff must demonstrate he or she suffered an adverse employment action. Lippman, 222 N.J. at 380. CEPA defines retaliation as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

To satisfy the fourth element of CEPA, a plaintiff must demonstrate "a causal connection . . . between the whistle-blowing activity and the adverse employment action." Dzwonar, 177 N.J. at 462.

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to "rebut the presumption of discrimination by articulating some legitimate nondiscriminatory reason for the adverse employment action." Allen, 246 N.J. at 290-91 (quoting Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999)). However, the "plaintiff [retains] the ultimate burden of proving that the

12

employer's proffered reasons were a pretext for the discriminatory action taken by the employer." Id. at 291 (quoting Kolb, 320 N.J. Super. at 478).

The trial court granted summary judgment because of plaintiff's failure to sufficiently identify the sources of law and public policy that were the basis of his CEPA claim. The court reasoned plaintiff's vague references to certain regulations "does not give [d]efendant, the potential jury, nor this court, the regulatory standard which would enable this court or a potential jury to evaluate plaintiff's claims against the applicable statutory benchmark." However, the court held plaintiff had established the prima facie element of causation and raised a genuine dispute of material fact regarding defendants' reason for firing as pretextual.

On appeal, plaintiff has addressed only the complaints he made regarding National Fire Protection Association ("NFPA") regulations, Center for Medicare & Medicaid Services ("CMS") regulations, the NEC, and Section 1135 of the Social Security Act. Therefore, we limit our analysis to plaintiff's complaints concerning these issues. See Green Knight Capital, LLC v. Calderon, 469 N.J. Super. 390, 396 (App. Div. 2021) ("An issue not briefed on appeal is deemed waived." (quoting Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 319 (App. Div. 2017))).

Section 1135 of the Social Security Act

Section 1135 authorizes the Secretary of Health and Human Services to waive certain federal regulations governing hospitals in the event of an emergency. 42 U.S.C. § 1320b-5(b). Although Section 1135 was clearly identified by plaintiff in his summary judgment brief, it is not a "law, or a rule or regulation promulgated pursuant to law" that may be violated. See N.J.S.A. 34:19-3(a)(1). It simply grants the Secretary discretion to relieve hospitals from the duty to comply with other regulations. Section 1135 cannot serve as the law or public policy to support plaintiff's CEPA claim.

Likewise, the trial court did not err in granting summary judgment on plaintiff's claims about defendants' failure to conduct inspections or maintain sprinkler systems in accordance with NFPA[1] regulations. For these complaints, plaintiff failed to satisfy the threshold requirement of identifying the "law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy," a required prong of a CEPA claim.

---

[1] The NFPA is a nonprofit organization that drafts fire-safety regulations, which "federal, state, and local governmental bodies have chosen to incorporate . . . by reference" into statutes and regulations. Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc., 753 F. Supp. 3d 933, 941 (C.D. Cal. 2024).

14

In Hitesman, the Court confirmed it is the plaintiff's burden to establish the existence of the law or policy. 214 N.J. at 39. In that case, the plaintiff testified about his employer's violations of "standard precautions" recommended by the Centers for Disease Control and Prevention. Ibid. The Court held this "vague reference" did not "provide what CEPA demands: evidence of a law, rule, regulation, declaratory ruling, professional code of ethics, or clear mandate of public policy that bears a substantial nexus to plaintiff's claim." Ibid. Although the plaintiff in Hitesman relied on the "improper quality of patient care" provisions of N.J.S.A. 34:19-3(a)(1) and (c)(1), its rationale is equally applicable to a plaintiff who complains about "a violation of a law, or a rule or regulation promulgated pursuant to law" or a "clear mandate of public policy." The plaintiff must sufficiently identify, not "vague[ly] reference[]," the law, regulation, or public policy at issue. See id. at 39.

Here, as the trial court stated, plaintiff made only vague references to the NFPA regulations, which were insufficient to satisfy the identification requirement. As the court noted in its opinion:

> [Plaintiff] specifically lists emergency lighting testing and inspections, fire extinguisher inspections, emergency shower inspections, gas alarms, emergency light and exit signs, and failing sprinklers. Instead of identifying the law, rule, regulation, or clear mandate

A-3581-23

of public policy that [plaintiff] contends Cape violated, [plaintiff] cites to his own deposition testimony:

> Q. Do you state anywhere in any of these weekly documents that any law, legal rule, legal regulation, or code is being violated?
>
> A. Yes. Again, it says all critical life safety codes and testing and inspections are on hold until after the furlough. That clearly states that the stuff is not getting done. It is a code.

> In his deposition he did not cite to any code section. In his Brief, [plaintiff] does not cite to any code section. A general reference to "code" is not sufficient; instead, [plaintiff] is required to identify the law, rule, regulation, or other authority that provides a definite standard by which a jury can measure an employer's conduct.

We perceive no error in the court's reasoning as plaintiff failed to satisfy his burden. Vague references are insufficient. The NFPA "develops roughly 300 codes and standards that serve as the foundation for fire, electrical, and life safety across the globe." National Fire Protection Association, Why NFPA Codes and Standards Matter, https://www.nfpa.org/about-nfpa/why-nfpa-codes-and-standards-matter (last visited Jan. 26, 2026). The trial court is not obligated

16

to search through those codes for the relevant regulation when plaintiff's counsel has failed to provide it.[2]

Nonetheless, plaintiff did sufficiently identify the regulations relevant to his complaints about "out-of-range humidity and temperature levels in the operating rooms."

Federal regulations, which hospitals must comply with to participate in Medicare, see 42 C.F.R. § 482.1(a)(1)(i), state that "[t]here must be proper ventilation, light, and temperature controls in pharmaceutical, food preparation, and other appropriate areas." 42 C.F.R. § 482.41(d)(4).

In his summary judgment brief, plaintiff quoted an interpretive guideline discussing this regulation[3] and provided a link to a document containing the guidelines. The relevant guideline provides:

---

[2] Of course, the identification requirement does not require the plaintiff to be personally aware of specific sections of the laws or regulations at the time he blows the whistle. See Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193 (1998) ("Whistleblower claims based on constitutional provisions, or on relatively unknown statutory or regulatory enactments, would be restricted unreasonably if their success were conditioned on the plaintiff's proof that he or she was aware specifically of the relevant source of public policy at the time of objection to the employer's practice."). But it does require plaintiff's counsel to assist the court in resolving the threshold question of law regarding the existence of a law, regulation, or public policy.

A-3581-23

Temperature, humidity and airflow in anesthetizing locations must be maintained within acceptable standards to inhibit microbial growth, reduce risk of infection, control odor, and promote patient comfort. Hospitals must maintain relative humidity (RH) levels at 35 percent or greater in each anesthetizing location, unless the hospital elects to use the CMS categorical waiver, which permits it to maintain a RH of at least 20 percent . . . . Hospitals must maintain records that demonstrate they have achieved the required levels. Although not required, CMS recommends that hospitals maintain the upper range of RH at 60 percent or less, as excessive humidity is conducive to microbial growth and compromises the integrity of wrapped sterile instruments and supplies.

[CMS, Pub. 100-07 State Operations Provider Certification, Transmittal 99 (Jan. 31, 2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R99SO MA.pdf.]

Plaintiff's references to the interpretive guidelines in his summary judgment brief and complaint were sufficient to meet the identification requirement. Additionally, plaintiff testified in his deposition that "humidity levels must be maintained between 20 and 60 percent" and personally observed the humidity levels in the operating rooms fall outside of this range. Based on this evidence,

---

[3] In fact, plaintiff quoted a guideline discussing 42 C.F.R. § 485.623(b)(5), applicable to Critical Access Hospitals. But sections 485.623(b)(5) and 482.41(d)(4), and their respective interpretive guidelines, contain nearly identical language. Moreover, the relevant guideline for § 482.41(d)(4) was included in the document for which plaintiff provided a link.

a jury could infer that he reasonably believed the hospital was violating the CMS regulations. Moreover, a jury could conclude he performed a whistle-blowing activity regarding the humidity levels because he testified in his deposition that he spoke to Carracino about the issue "[a]pproximately once a month." Therefore, the trial court's grant of summary judgment on this complaint was erroneous.

Likewise, plaintiff sufficiently identified sections 501.10(B)(1) and 501.15(A)(4) of the National Electric Code. On August 25, 2020, plaintiff sent an email to multiple people, including Carrocino, where he informed them "one of my electricians noticed the electric was not code compliant" in the hospital's sewage ejector pit and included an attachment with a photograph, annotated by plaintiff stating: "[N]eed[s] to follow [NEC] standard[s]," sections 501.10(B)(1) and 501.15(A)(4). These sections of the NEC were identified by plaintiff in his summary judgment brief. The citations provided by plaintiff were thus sufficient to meet the identification requirement.

Article 501 of the NEC "covers the requirements for electrical and electronic equipment" in locations with flammable gases, vapors, or liquids. Section 501.10(B)(1) permits the following as a wiring method: "Rigid Metal conduit (RMC) and intermediate metal conduit with listed threadless fittings."

Section 501.15(A)(4) states, "A conduit seal shall be required in each conduit run leaving a Division 1 location. The sealing fitting shall be permitted to be installed on either side of the boundary within 3.05 m (10ft) of the boundary." In his email plaintiff noted: "Tank lid not grounded, and the improper connections were used from the tank to the panel for hazardous gasses." A jury may conclude plaintiff reasonably believed the hospital was violating those regulations and the email was sufficient to constitute a whistle-blowing activity. The trial court erred in granting summary judgment regarding this complaint.

Affirmed in part, reversed in part, and remanded for continued proceedings limited to plaintiff's complaints about the humidity/temperature levels and NEC violations. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3581-23